(65 South. 233)

No. 20,091.

PARENT v. FIRST NAT. BANK OF GULF-PORT, MISS., et al.

(April 13, 1914.   Rehearing Denied May 25, 1914.)

*(Syllabus by the Court.)*

1. HUSBAND AND WIFE (§ 201*) — MARRIED WOMAN—SEPARATE REAL ESTATE—CONVEYANCES—MORTGAGE—VACATION.

Where a married woman, authorized by her husband, made an absolute sale of her paraphernal real estate, as shown by a notarial act duly recorded, and her vendee conveyed the property to a corporation, in which the wife was the largest shareholder, and the company mortgaged the premises to a bank to secure money for the purposes of its business, *held*, that the wife cannot assail the mortgage held by the bank on the grounds of marital coercion, error, or fraud in the original sale.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 735; Dec. Dig. § 201.*]

2. VENDOR AND PURCHASER (§ 233*)—FAILURE TO RECORD INSTRUMENT—EFFECT.

Under codal law unrecorded agreements and contracts are "utterly null and void except between the parties thereto," and the jurisprudence is well settled that notice is not equivalent to registry.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 563–566; Dec. Dig. § 233.*]

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Action by Alice M. Parent, wife of A. J. Cranor, against the First National Bank of Gulfport, Miss., and others. From a judgment in favor of defendant bank, plaintiff appeals. Affirmed.

J. F. Pierson and Carleton Hunt, both of New Orleans, for appellant. W. S. Lewis, of New Orleans, for appellees.

LAND, J.   Plaintiff is a married woman, separate in property from her husband by judgment of court rendered in June, 1899. Plaintiff, in 1905, acquired in her own name two certain vacant squares situated in the city of New Orleans.

[1] On September 6, 1907, the said plain-

tiff, aided and authorized by her husband, executed a notarial act of sale, in the usual form, by which she sold and delivered said squares to Joel B. Bateman, Jr., for the price of $8,000, of which $4,000 was acknowledged to have been paid in cash, and for the remaining $4,000 the purchaser gave his note indorsed by him in blank, and secured by vendor's privilege on the property conveyed. This act was duly recorded as a sale and mortgage.

On the same day, by a private writing signed by himself alone, J. B. Bateman, Jr., acknowledged that the two squares belonged to Mrs. Andrew J. Cranor, and that the title was put in his name for convenience, and retransferred the property in the words following, to wit:

"In consideration of the foregoing, I do hereby sell, transfer, convey, and deliver to the said Mrs. A. J. Cranor the above-described property, the registry of this counter letter in the conveyance office to be a complete title to the said Mrs. A. J. Cranor."

This instrument was not recorded.

On May 12, 1908, Joel B. Bateman, Jr., by private act duly acknowledged and recorded, sold said property to the Cranor Lumber Company for the price of $8,000, acknowledged by said vendor to have been paid in cash.

It appears that on June 3, 1908, the Cranor Lumber Company mortgaged said squares, with other property consisting of lands, timber, sawmill plant, etc., to the First National Bank of Gulfport, Miss., to secure an indebtedness of $25,000, represented by 20 notes for $1,250 each maturing at different dates.

In October, 1910, the present suit was instituted by Mrs. O. J. Cranor for the purpose of having the act of September 6, 1907, decreed to be a mortgage, and not a sale, and of having the transfer made by Joel B. Bateman, Jr., to the Cranor Lumber Company and the mortgage from said company to the bank declared to be unauthorized, illegal, and wrongful, null, and void as to her property, and of having said mortgages in said squares canceled, and of having petitioner decreed to be the owner of said property.

The petition represents that the sale to Joel B. Bateman, Jr., was intended as a mortgage for $4,000 to enable her husband, who was president of the Cranor Lumber Company, to secure a temporary loan for the corporation from the First National Bank of Gulfport, Miss., until a larger loan for $15,000 could be made available, when it was understood the mortgage for $4,000 would be extinguished and canceled.

The petitioner further represents that, when she signed the act of sale to Bateman, the counter letter was handed to her, and that she was assured that the transaction was only a mortgage; that the note for $4,000 was delivered to her husband in order to carry out her promise to mortgage the property for him; and that the bank, when it loaned her husband $4,000 on the security of the note, was cognizant of the true nature of the transaction between petitioner and Bateman, and was cognizant of ample facts and circumstances to put it on inquiry.

The petition further alleged that the sale from Bateman, Jr., to the said Cranor Lumber Company was false and fictitious to the knowledge of the said bank, which taking advantage of the financial condition of the Cranor Lumber Company forced it to include petitioners' said squares in the aforesaid omnibus mortgage for $25,000, which covered, not only the contemplated loan for $15,000, but also the additional sum of $10,000, alleged to be due said bank by the insolvent corporation styled A. J. Cranor Company, Limited.

The defendant answered, denying each and every allegation of the petition, save such as were thereinafter specially admitted. The defendant averred that the A. J. Cranor

Company and the Cranor Lumber Company were in law the same, being composed of the same stockholders, and that the plaintiff subscribed to 150 shares of the former, and to 25 shares of the latter, for which she had never paid. Respondent admitted that it had received a mortgage note for $4,000 from A. J. Cranor, president of the Cranor Lumber Company, and that subsequently the two squares of ground were mortgaged to respondent, together with other property, to secure advances made by respondent, and that, after the mortgage was executed, respondent had the said $4,000 note canceled; that about August, 1909, respondent foreclosed said mortgages in the federal court of this district, which foreclosure proceedings were still pending, and that shortly thereafter A. J. Cranor, acting for the Cranor Lumber Company, and in his own behalf, and the plaintiff herein both requested respondent not to sacrifice said two squares at a forced sale, and that respondent thereupon suggested a liquidation of the affairs of the Cranor Lumber Company, through liquidators to be appointed, with the view of realizing as much as possible for the property of said company, and of avoiding a sale of said squares; that this suggestion was acceptable to the plaintiff and other stockholders of the Cranor Lumber Company, and later was agreed to by resolution adopted at a meeting of said stockholders held in September, 1909, at which liquidators were appointed with authority to sell the company's property, including said squares, at public or private sale; that the plaintiff attended said meeting in person and voted her stock in favor of said resolution, and that the plaintiff made no claim then, or at any other time until she filed this suit, that she had been illegally deprived of the said squares; that the respondent, upon the passage of said resolution, promptly called off the sale under its foreclosure proceedings, maintaining its

seizure; that on the faith of said resolution respondent advanced from time to time funds to the liquidators, including funds to redeem said squares from a tax sale, to the amount of about $3,000, there being no funds to the credit of the company for any purpose, as plaintiff well knew.

Respondent further averred that it dealt with the Cranor Lumber Company, and acquired its mortgage in good faith; that the loan covered by its mortgage was in no way to pay and discharge the personal indebtedness of plaintiff's husband, A. J. Cranor, but was to protect for all substantial purposes the separate interests of the plaintiff; that the Cranor Lumber Company acquired title from Bateman in good faith, and with the knowledge and consent of the plaintiff; and that plaintiff is estopped and precluded from disputing her transfer of the said two squares to Bateman and his transfer of the same to the Cranor Lumber Company.

The cause was tried, and plaintiff has appealed from a judgment in favor of the defendant bank.

On the face of the public records, it appears that Mrs. A. J. Cranor sold the squares in question to Joel B. Bateman, Jr., and that he sold the same to the Cranor Lumber Company, and that the company mortgaged said squares, with other property, to the First National Bank of Gulfport.

Mrs. A. J. Cranor was separate in property from her husband, and managed her own affairs. She made investments in real estate, and also in the shares of the A. J. Cranor Company, and after its failure she purchased 25 shares of the stock of the Cranor Lumber Company; the remaining shares being held by her husband, her daughters, and her sons-in-law. The corporation embarked in the sawmill business, and invested all of its available capital in timber lands and timber, and in the erection of a plant for the manufacture of lumber.

It became necessary for the company to negotiate a loan for $15,000, and for that purpose its president applied to the First National Bank of Gulfport. That institution had sustained a loss of some $12,000 through the failure of the A. J. Cranor Company, composed of the same stockholders, and naturally sought to obtain security for the payment of this debt before making further advances to the same parties. The negotiations covered six months or more, and during their pendency the Cranor Lumber Company, being in urgent need of $4,000, endeavored to secure a temporary loan on the security of the two squares of ground belonging to Mrs. Cranor, who consented to mortgage the property for the purpose of raising the amount required to pay the pressing debts of the company, in which she was the principal stockholder. The mortgage as executed was made in the form of a sale of the squares from Mrs. Cranor to Bateman as above stated. Mr. Cranor, as president of the company, took the note given for the credit portion of the price, and secured a loan thereon of $4,000 from the First National Bank of Gulfport, who advanced the money on the faith of the act of sale from Mrs. Cranor to Bateman.

This temporary loan of $4,000 was merged in the omnibus loan for $25,000, secured by mortgage on said squares, and the lands, timber, plant, etc., of the Cranor Lumber Company, and on the execution of said mortgage the note for $4,000 was canceled.

During the progress of the negotiations, the bank insisted that the indebtedness to it of the A. J. Cranor Company to the amount of $10,000 should form a part of the total mortgage debt; that the two squares then standing in the name of Bateman should be transferred to the Cranor Lumber Company and included in the mortgage. These conditions were complied with.

The representatives of the bank testified that they acted on the faith of abstracts of title furnished by the Cranor Lumber Company, and knew nothing of the agreements or understandings between Mrs. Cranor, Bateman, and Cranor, as president of the Cranor Lumber Company. Cranor could not testify, and Mrs. Cranor did not know and had no communications with the officers of the bank. Bateman held the title to the squares and testified that, when the bank wanted to include them in the mortgage, he told Mr. King, vice president of the bank, that it could not be done, because the squares did not belong to the Cranor Lumber Company, but belonged to Mrs. Cranor, and that the principal talk he had with King was over the telephone. King testified that Bateman never told him that the squares belonged to Mrs. Cranor. On September 13, 1907, the company, through A. J. Cranor, president, wrote to King, vice president of the bank, as follows:

"Referring to last conversation with you over the phone, as your proposal that we put in the two squares of ground in addition to the Varnado property, and you would loan us fifteen thousand. This we could not consider for a moment, as we told you over the phone that we had no control over the two squares."

This was literally true, as the property then stood on the records in the name of J. B. Bateman, Jr., and the bank had already loaned the company $2,000 on Bateman's note for $4,000, as is stated in the same letter. On May 12, 1908, Bateman conveyed the two squares to the Cranor Lumber Company for the purported consideration of $8,000, cash in hand paid. On June 3, 1908, the said company executed the said mortgage for $25,000, which included the two squares in dispute. The negotiations for this loan had commenced about September 1, 1907. During this interval a large number of letters passed between the parties.

This correspondence shows persistent efforts by the Cranor Company to procure an agreement limiting the liability of the two

squares to $5,000, and that, while this proposition was considered by the bank, it was never accepted, as far as shown by the record. The proposition was certainly not included in the act of mortgage.

The testimony of Mr. Gayer, the notary before whom the act of mortgage for $25,000 was passed, is vague and unsatisfactory. After reciting a discussion or conversation between Mr. Cranor and Mr. King, Sr., attorney for the bank, on the occasion just referred to, Mr. Gayer's examination proceeded as follows:

"Q. What knowledge did the bank have at that time—or did Mr. King acquire relative to the ownership of these two squares?

"A. If he had any knowledge—

"Q. Of the ownership of Mrs. Cranor?

"A. I don't know whether he had any knowledge of the ownership of Mrs. Cranor. The only conversation which I say was in my presence was that Mr. Cranor said he wanted a release on the payment of $5,000 of the mortgage, and used the word 'loaned,' and the question of the document he wanted Mr. King to sign. That is all the discussion relative to the ownership of the property other than that the Cranor Lumber Company was the owner of it, and was to be put in the mortgage. I understood they were the owners of the property at the time, and the only discussion as to whether anybody else owned it was the conversation I mentioned at the time of the mortgage."

Under the stress of leading questions the witness was made to answer that Mr. Cranor told Mr. King that the property was loaned to the Cranor Lumber Company; but it is evident from the whole examination that this was merely a deduction from the use by Cranor of the word "loaned" during his conversation with King, Sr. The same witness stated that, when Cranor said something about a contract relative to the property in New Orleans, Mr. King replied that he had never heard anything of that nature, and refused to sign a writing prepared by the witness at the suggestion of Mr. Cranor, and further said that he was limited in his instructions, and that, if Mr. Cranor wanted to discuss anything of that nature, he could discuss it with the officials of the bank.

Mr. King, Sr., testified that Mr. Gayer was both notary and attorney for Mr. Cranor, and that in the conversation referred to by Mr. Gayer nothing was said about the two squares having been loaned to the Cranor Lumber Company. Mr. King further testified that he told Mr. Cranor that he did not know anything about an agreement to release the two squares on the payment of $5,000, that it was beyond his instructions, that he could not consent to it, and that Mr. Cranor would have to settle the matter with the bank when he got home. After this conversation the mortgage was signed. Of course the statement of Mr. Cranor as to the alleged agreement with the bank is merely hearsay. There is no sufficient evidence in the record that any such agreement was made.

The argument that Mrs. Cranor's possession of the vacant squares was notice to the bank of her ownership is without force. Whatever possession she may have had was transferred by her sale of the premises to Bateman by authentic act, because:

"The law considers the tradition or delivery of immovables, as always accompanying the public act, which transfers the property." Civil Code, 2479.

[2] The unrecorded counter letter between Mrs. Cranor and Bateman was—

"utterly null and void, except between the parties thereto." Civil Code, 2266.

It is our fixed jurisprudence that notice is not equivalent to registry. McDuffie v. Walker, 125 La. 152, 51 South. 100. In the same case the court said:

"It cannot, however, be said that a third person perpetrates a fraud merely by treating as void, as to himself, a contract which the law in terms declares 'shall be utterly null and void except between the parties.'"

It is also well settled that, where a married woman, with the authorization of her husband, makes an apparently valid sale of her paraphernal real estate by act duly recorded, and her vendee sells the property to a third person, purchasing on the faith of the public

records, the latter acquires a legal title, which cannot be assailed by the wife on the ground of marital coercion, error, or fraud in the original sale. Colgin v. Courrege, 106 La. 684, 31 South. 144; Thompson v. Whitbeck, 47 La. Ann. 49, 16 South. 570; Lester v. Connelly, 46 La. Ann. 340, 15 South. 4.

The defendant bank had nothing to do with the sale from Mrs. Cranor to Bateman, and had the legal right to deal with Bateman and his assigns as owners of the property. Under the rule announced in McDuffie v. Walker, supra, a third person may disregard unrecorded agreements, and in so doing perpetrates no fraud on any one.

Judgment affirmed.

O'NIELL, J., takes no part.